NO. COA13-1059

NORTH CAROLINA COURT OF APPEALS

Filed: 21 October 2014

STATE OF NORTH CAROLINA

    v.                         Chatham County
                                  Nos. 10CRS052754-55

RONALD MICHAEL McCRARY,
    Defendant.


Appeal by defendant from judgment entered on or about 21 March 2013 by Judge W. Osmond Smith in Chatham County Superior Court. Heard in the Court of Appeals 20 February 2014.

> *Attorney General Roy A. Cooper, III, by Assistant Attorney General Catherine F. Jordan, for the State.*

> *Wait Law, P.L.L.C., by John L. Wait for defendant-appellant.*


STROUD, Judge.


Ronald Michael McCrary ("defendant") appeals from a judgment entered upon jury verdicts finding him guilty of driving while impaired ("DWI") and communicating threats. Defendant argues that the trial court erred by (1) denying his motion to suppress the evidence that resulted from a warrantless blood test; and (2) denying his motion to dismiss. We affirm the trial court's order denying defendant's motion to dismiss, but,

as to defendant's motion to suppress, we remand for additional findings of fact.

## I.    Background

We will summarize the relevant facts based upon the trial court's findings of fact, which are not challenged by defendant. At 6:34 p.m. on 28 December 2010, Deputy Justin Fyle of the Chatham County Sheriff's Office responded to a report of suspicious activity at the home of Marshall Lindsey.  Upon his arrival at 7:01 p.m., Deputy Fyle observed a red Isuzu Trooper parked in a driveway near Lindsey's garage.

Deputy Fyle approached the vehicle and discovered defendant seated in the driver's seat.  The vehicle's engine was not operating, and defendant appeared to be asleep.  Deputy Fyle attempted to get defendant's attention, but defendant did not respond.  Shortly thereafter, defendant began looking at his cell phone, which was upside down, but he continued to ignore Deputy Fyle.

Deputy Fyle then opened the vehicle's door to investigate further.  When he opened the door, Deputy Fyle detected a strong odor of alcohol and noticed that defendant's eyes were red and glassy.  There was a nearly empty vodka bottle in the vehicle. Deputy Fyle administered an Alcosensor test, and the results

were "so high that Deputy Fyle determined that there may be a need for medical attention for the defendant."

Deputy Fyle also spoke to Lindsey, who stated that he had witnessed defendant make multiple attempts to turn into his driveway from the road. When defendant finally was able to enter the driveway, he ran over one of Lindsey's potted plants and a landscape light. Deputy Fyle observed tracks in the snow at the end of Lindsey's driveway that were consistent with Lindsey's statement.

Deputy Fyle returned to defendant and attempted to administer several field sobriety tests, but defendant was unable to stand up to perform them. Deputy Fyle arrested defendant for DWI at 7:34 p.m. Upon his arrest, defendant began complaining of chest pains and requested to be taken to the hospital. Deputy Fyle contacted emergency medical services (EMS) personnel, who arrived at 7:39 p.m. While EMS personnel examined defendant, Deputy Fyle determined that he would bring defendant to the Sheriff's Office for processing after he was released by EMS personnel. However, Deputy Fyle also decided that if defendant needed to be taken to the hospital, he would obtain a blood sample without a warrant.

While the EMS personnel tried to evaluate defendant's medical condition, defendant was "continually yelling and uncooperative" and would not permit them to properly examine him. Instead, defendant requested transport to the hospital. At the direction of his sergeant, Deputy Fyle directed EMS personnel to comply with defendant's request. Deputy Barry Ryser, a police officer assisting Deputy Fyle, accompanied defendant inside the EMS vehicle, and Deputy Fyle followed them in his patrol car.

Defendant arrived at the hospital emergency room at 8:39 p.m. Deputy Fyle removed defendant's handcuffs so that he could be examined, but defendant refused to cooperate with the medical staff and did not consent to any medical treatment. He was "extremely belligerent, yelling at officers and medical personnel" and he insulted the officers as well as others. "The defendant's continued uncooperative conduct . . . led Deputy Fyle to conclude that the defendant was intentionally delaying the investigation." Prior to defendant's discharge from medical care, Deputy Fyle asked defendant to submit to a blood test and informed defendant of his rights regarding a blood test at 8:51 p.m. Defendant refused to consent to a blood test, and his "belligerent conduct accelerated." "He issued vile insults and

threats to Deputy Fyle and others, including threatening to spit on Deputy Fyle and others." After emergency room personnel concluded their examination of defendant, he was discharged at 9:13 p.m. Therefore, Deputy Fyle decided to have defendant's blood drawn without a warrant.

Deputy Fyle requested that hospital personnel assist him with obtaining defendant's blood sample. Deputy Fyle required the assistance of the other officers and used restraints to protect both the officers and hospital staff from defendant while his blood was drawn at 9:16 p.m., almost 3 hours after Lindsey's call. Deputy Fyle and defendant subsequently left the hospital at 9:29 p.m. and arrived at the magistrate's office for further processing at 9:43 p.m.

Defendant was charged with DWI, possession of an open container, assault on a government official, communicating threats, resisting a public officer, and injury to personal property. After a bench trial in Chatham County District Court, defendant was found not guilty of possession of an open container and injury to personal property and guilty of all other charges. Defendant appealed to the Chatham County Superior Court for a trial *de novo*.

On 12 September 2012, defendant filed a motion to dismiss the charges against him, contending that the warrantless blood draw was flagrantly unconstitutional. At a hearing in which the trial court treated defendant's motion as both a motion to dismiss and a motion to suppress, Deputy Fyle testified that he called Magistrate Tyson at 7:15 p.m., before he arrested defendant, to seek his opinion about the situation. Deputy Fyle also testified that he called the magistrate after defendant's blood draw. Deputy Fyle further testified that he waited at the magistrate's office less than thirty minutes before meeting with the magistrate. Deputy Fyle finally testified that, at the time, he determined that it would be unreasonable to seek a warrant before conducting a blood draw given the circumstances. The trial court denied defendant's motion to dismiss. Beginning 18 March 2013, defendant was tried by a jury in superior court.

On 21 March 2013, the jury returned verdicts finding defendant guilty of DWI and communicating threats and not guilty of all other charges. For the DWI offense, the trial court sentenced defendant to an active term of six months. For the communicating threats offense, the trial court sentenced defendant to an active term of 120 days. The sentences were to

be served consecutively in the North Carolina Division of Adult Correction. Defendant gave notice of appeal in open court.

## II. Exigent Circumstances for a Warrantless Blood Test

Defendant argues that the trial court erred by denying his motion to suppress the evidence that resulted from the warrantless blood test because, under *Missouri v. McNeely*, Deputy Fyle "had ample time and ability to secure a search warrant" while defendant was in custody. *See* ___ U.S. ___, 185 L.Ed. 2d 696, 702 (2013). We remand for additional findings of fact on this issue.

In ruling upon a motion to suppress evidence, "the [trial court] must set forth in the record [its] findings of fact and conclusions of law." N.C. Gen. Stat. § 15A-977(f) (2013). "[T]he general rule is that [the trial court] should make findings of fact to show the bases of [its] ruling." *State v. Phillips*, 300 N.C. 678, 685, 268 S.E.2d 452, 457 (1980); *see also State v. Salinas*, 366 N.C. 119, 123, 729 S.E.2d 63, 66 (2012). "The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Biber*, 365 N.C. 162,

167-68, 712 S.E.2d 874, 878 (2011). Conclusions of law are reviewed *de novo*. *Id.* at 168, 712 S.E.2d at 878.

> Findings and conclusions are required in order that there may be a meaningful appellate review of the decision on a motion to suppress. . . . [W]hen the trial court fails to make findings of fact sufficient to allow the reviewing court to apply the correct legal standard, it is necessary to remand the case to the trial court. Remand is necessary because it is the trial court that is entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, find the facts, and, then based upon those findings, render a legal decision, in the first instance, as to whether or not a constitutional violation of some kind has occurred.

*Salinas*, 366 N.C. at 124, 729 S.E.2d at 66-67 (citations and quotation marks omitted). Deputy Fyle performed a warrantless blood draw on defendant under the provisions of North Carolina General Statutes, section 20-139.1(d1), which provides that

> [i]f a person refuses to submit to any test or tests pursuant to this section, any law enforcement officer with probable cause may, without a court order, compel the person to provide blood or urine samples for analysis if the officer reasonably believes that the delay necessary to obtain a court order, under the circumstances, would result in the dissipation of the percentage of alcohol in the person's blood or urine.

N.C. Gen. Stat. § 20-139.1(d1) (2009). This statutory procedure is also subject to limitations on searches imposed by the state

and federal constitutions. "Our courts have held that the taking of blood from a person constitutes a search under both" the United States and North Carolina Constitutions. *State v. Barkley*, 144 N.C. App. 514, 518, 551 S.E.2d 131, 134 (2001). Accordingly, "a search warrant must be issued before a blood sample can be obtained, unless probable cause and exigent circumstances exist that would justify a warrantless search." *State v. Carter*, 322 N.C. 709, 714, 370 S.E.2d 553, 556 (1988). The issue in cases of this sort normally depends upon the findings and conclusions as to the existence of "exigent circumstances" as our case law has defined that term, considering the "totality of the circumstances" in each case. *State v. Dahlquist*, ___ N.C. App. ___, ___, 752 S.E.2d 665, 667 (2013), *appeal dismissed and disc. rev. denied*, ___ N.C. ___, 755 S.E.2d 614 (2014).

In *State v. Fletcher*, this Court held that the trial court properly found that exigent circumstances existed for the arresting officer to obtain a blood sample from the defendant without a warrant, where the evidence showed that the defendant had "failed multiple field sobriety tests" and was unsuccessful in "producing a valid breath sample using the Intoximeter at the police station." 202 N.C. App. 107, 111, 688 S.E.2d 94, 97

(2010). The officer testified about "the distance between the police station and the magistrate's office, her belief that the magistrate's office would be busy late on a Saturday night, and her previous experience with both the magistrate's office and hospital on weekend nights[,]" all of which supported a "probability of significant delay" to obtain a warrant. *Id.* at 111, 688 S.E.2d at 97. This Court held in *Fletcher* that these circumstances supported a finding of exigent circumstances and affirmed the trial court's denial of the defendant's motion to suppress. *Id.* at 113, 688 S.E.2d at 98.

More recently, the United States Supreme Court has addressed the issue of obtaining warrantless blood tests from defendants suspected of impaired driving. In *Missouri v. McNeely*, the United States Supreme Court held that "the natural metabolization of alcohol in the bloodstream" does not create a "a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." ___ U.S. at ___, 185 L.Ed. 2d at 702. In *McNeely*, the Supreme Court noted, however, that "some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless

blood test." *Id.* at ___, 185 L.Ed. 2d at 707. Such circumstances "may arise in the regular course of law enforcement due to delays from the warrant application process." *Id.* at ___, 185 L.Ed. 2d at 709. The Supreme Court noted that

> while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber* [*v. California*, 384 U.S. 757, 16 L.Ed. 2d 908 (1966)], it does not do so categorically. Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances.

*Id.* at ___, 185 L.Ed. 2d at 709. Thus, the circumstances that may make obtaining a warrant impractical may in some cases support the trial court's finding of an exigent situation in which a warrantless blood draw is proper. *Id.* at ___, 185 L.Ed. 2d at 709. "Therefore, after the Supreme Court's decision in *McNeely*, the question for this Court remains whether, considering the totality of the circumstances, the facts of this case gave rise to an exigency sufficient to justify a warrantless search." *Dahlquist*, ___ N.C. App. at ___, 752 S.E.2d at 667.

Defendant does not challenge the trial court's findings of fact but argues only that his case is similar to the situation presented in *Missouri v. McNeely*, which was decided by the

United States Supreme Court just over a month after the trial court ruled upon his motion to suppress. Defendant focuses on the lack of findings of fact as to the time that it would have taken Deputy Fyle to obtain a search warrant for the blood test. Defendant argues that "Officer Fyle's testimony is strikingly similar to the testimony found insufficient in *McNeely*." The Supreme Court noted that

> [i]n his testimony before the trial court, the arresting officer did not identify any other factors that would suggest he faced an emergency or unusual delay in securing a warrant. He testified that he made no effort to obtain a search warrant before conducting the blood draw even though he was "sure" a prosecuting attorney was on call and even though he had no reason to believe that a magistrate judge would have been unavailable. The officer also acknowledged that he had obtained search warrants before taking blood samples in the past without difficulty. He explained that he elected to forgo a warrant application in this case only because he believed it was not legally necessary to obtain a warrant.

___ U.S. at ___, 185 L.Ed. 2d at 714 (citations omitted).

But the factual circumstances presented by this case and *McNeely* are quite different. *McNeely* involved a DWI stop described as "unquestionably a routine DWI case" involving a cooperative defendant with no need for medical treatment and no need for "police to attend to a car accident." *Id.* at ___, 185

L.Ed. 2d at 714. As the unchallenged findings of fact in this case as noted above demonstrate, this case was not "a routine DWI case." From the moment that Deputy Fyle placed defendant into custody, at 7:34 p.m., defendant claimed to have chest pain and to require medical assistance, which he then refused and actively fought. He became increasingly belligerent and threatened Deputy Fyle and others.[1] Ultimately Deputy Fyle determined that defendant was intentionally delaying his investigation. Also unlike the officer in *McNeely*, Deputy Fyle testified at the suppression hearing as to the time it would have taken to obtain a warrant, as follows:

> Considering that this is Chatham County and we don't have as many magistrates as other places on duty and all the time, a lot of times when you need a search warrant and somebody is placed in custody during nighttime hours, we have to actually call out the magistrate and at times wait for them to arrive and sometimes wait for other people to process prisoners before we can see them. So I was not aware of there being a magistrate in Siler City, which is where we were, because, like I said, during nighttime hours, they are not there. And I was unaware if in Pittsboro there was a magistrate on duty at the time. I felt that it was unreasonable for me to load him up, go back to Pittsboro, possibly wait for the magistrate to get there, draw up the search warrant, get the magistrate to sign it, load

---

[1] Defendant did not challenge on appeal his conviction of communicating threats.

> him back up, go back to Siler City, and then do the blood draw when we were losing evidence.

Defendant asks us to second-guess the officer's determinations about how long it might have taken to obtain a warrant and whether it would have been reasonable for him to take the increasingly belligerent defendant, "load him up, go back to Pittsboro, possibly wait for the magistrate to get there, draw up the search warrant, get the magistrate to sign it, load him back up, go back to Siler City, and then do the blood draw when [he was] losing evidence." Defendant claims that the dispositive question, under *McNeely* and *Schmerber*, is "Did Officer Fyle have the time and ability to seek out a warrant?" Defendant argues that he did, and that the trial court failed to address the availability of a magistrate or "whether Officer Fyle should have sought a warrant since Officer Ryser was accompanying [defendant] in the EMS vehicle." Yet all of these questions are squarely within the authority of the trial court to make the factual findings as to these issues and to make the appropriate legal conclusions upon those facts. It is the trial court that "is entrusted with the duty to hear testimony, weigh and resolve any conflicts in the evidence, find the facts, and, then based upon those findings, render a legal decision, in the

first instance, as to whether or not a constitutional violation of some kind has occurred." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 620 (1982).

We find this case to be more similar to *State v. Granger* than to *McNeely*. *See* ___ N.C. App. ___, 761 S.E.2d 923 (2014). In *Granger*, this Court found that the trial court properly concluded that the totality of the circumstances showed exigent circumstances that justified the warrantless blood draw. *Id.* at ___, 761 S.E.2d at 928. There, the defendant was injured in a wreck and required medical care. *Id.* at ___, 761 S.E.2d at 924. The officer was investigating the case alone and would have had to wait for another officer to come to the hospital so that he could travel to the magistrate to obtain a warrant. *Id.* at ___, 761 S.E.2d at 928. The trial court also noted the officer's "knowledge of the approximate probable wait time" and travel time to the magistrate. *Id.* at ___, 761 S.E.2d at 928. In addition, the officer was concerned that medications could have been administered to the defendant as part of his treatment that could contaminate the blood sample. *Id.* at ___, 761 S.E.2d at 928.

Although the situation here is different from *Granger* in that the defendant here only feigned a need for medical care and

in fact needed none, they are otherwise similar. Obtaining a warrant may have required an officer to either leave the defendant, which in this case may not have been a reasonable option even with more than one officer present, considering defendant's threats to Deputy Fyle and others, or take the defendant with him to Pittsboro and then back to Siler City. The evidence and uncontested findings of fact show that several officers were needed to control the defendant and ensure the safety of the hospital personnel.[2] In Conclusion of Law No. 6, the trial court concluded that

> [b]ased upon the time elapsed to that point and the additional time and uncertainties in how much additional time would be needed to obtain a search warrant or other court order for defendant's blood and all other attendant circumstances, the same gave rise to the existence of exigent circumstances and supported the officer's reasonable belief that the additional delay necessary

---

[2] The dissent would find that even taking into account defendant's belligerent behavior, the presence of so many officers would lead to the conclusion that there was no plausible justification for an exception to the warrant requirement under the totality of the circumstances. *See McNeely*, ___ U.S. at ___, 185 L.Ed. 2d at 708. We believe that this sort of determination is a factual determination that can be made only by the trial court that heard the evidence and observed all of the witnesses. An appellate court, far removed from the real physical dangers presented by a combative, highly intoxicated defendant, is in a poor position to make a finding of fact about how many officers are reasonably needed to protect themselves and others in that moment. That is the job of the trial judge.

to obtain a search warrant or court order under the circumstances would result in the dissipation of the percentage of alcohol in the defendant's blood.

Defendant is correct that the trial court did not make any specific findings addressing the availability of a magistrate at the time of the incident and the probable delay in seeking a warrant, although Deputy Fyle did testify about this matter, but it seems from the above conclusion of law that the trial court considered the time factor in mentioning the "additional time and uncertainties in how much additional time would be needed to obtain a search warrant." Without findings of fact on these details, however, we cannot properly review this conclusion. We must therefore remand this matter to the trial court for additional findings of fact as to the availability of a magistrate and the "additional time and uncertainties" in obtaining a warrant, as well as the "other attendant circumstances" that may support the conclusion of law that exigent circumstances existed.

## III. Motion to Dismiss

Defendant's motion before the trial court was styled as a motion to dismiss pursuant to N.C. Gen. Stat. § 15A-954(a)(4), which requires dismissal of criminal charges if "defendant's constitutional rights have been flagrantly violated and there is

such irreparable prejudice to the defendant's preparation of his case that there is no remedy but to dismiss the prosecution." N.C. Gen. Stat. § 15A-954(a)(4) (2013). However, at the hearing on defendant's motion, both parties agreed to treat the motion as both a motion to dismiss and a motion to suppress. Both of these motions were subsequently denied by the trial court. On appeal, defendant requests that this Court reverse the trial court's order as to both motions.

In *State v. Wilson*, the trial court found that a warrantless blood draw had violated the defendant's constitutional rights and dismissed the charges against him. ___ N.C. App. ___, ___, 736 S.E.2d 614, 616 (2013). On appeal, this Court held that dismissal was an inappropriate remedy:

> In his motion to dismiss, defendant argued the officer's conduct flagrantly violated his constitutional rights "and there is such irreparable prejudice to the defendant's preparation of his case that there is no remedy but to dismiss the prosecution." While defendant's motion addresses the alleged flagrant violation of his constitutional rights, his motion in no way details how there was irreparable damage to the preparation of his case as a result. Indeed, the trial court made no such finding or conclusion, and defendant has made no such argument on appeal. Thus, we fail to see how the alleged constitutional violation at issue here irreparably prejudiced the preparation of defendant's case, and section

> four of the dismissal statute likewise does
> not apply to the present case.

*Id.* at \_\_\_\_, 736 S.E.2d at 617-18. Instead, "the appropriate argument by defendant was for suppression of the evidence, and the only appropriate action by the trial court under the circumstances of the present case was to consider suppression of the evidence as the proper remedy if a constitutional violation was found." *Id.* at \_\_\_, 736 S.E.2d at 618.

Likewise, in the instant case, while defendant's motion to dismiss asserts that the warrantless blood draw was a flagrant violation of his constitutional rights, "his motion in no way details how there was irreparable damage to the preparation of his case as a result" and "defendant has made no such argument on appeal." *See id.* Thus, pursuant to *Wilson*, "the only appropriate action by the trial court under the circumstances of the present case was to consider suppression of the evidence as the proper remedy if a constitutional violation was found." *See id.* Accordingly, we affirm the trial court's order denying defendant's motion to dismiss.

## IV. Conclusion

We affirm the trial court's order denying defendant's motion to dismiss. However, we remand to the trial court to make additional findings of fact addressing the availability of a

magistrate and the "additional time and uncertainties" in obtaining a warrant, as well as the "other attendant circumstances" that bear upon the conclusion of law that exigent circumstances existed that justified the warrantless blood draw.

AFFIRMED, in part, and REMANDED.

Judge DAVIS concurs.

Judge CALABRIA dissents in a separate opinion.

NO. COA13-1059

NORTH CAROLINA COURT OF APPEALS

Filed:  21 October 2014

STATE OF NORTH CAROLINA


   v.                                  Chatham County
                                      Nos. 10 CRS 52754-55
RONALD MICHAEL McCRARY



   CALABRIA, Judge, dissenting.


   Because I believe that, based upon the testimony presented below, remanding this case for further findings would be futile, I must respectfully dissent from the majority's opinion.  I would reverse the trial court's denial of defendant's motion to suppress and remand for a new trial.

   As an initial matter, I agree with the majority that defendant's self-styled "Motion to Dismiss" based upon the warrantless blood draw is most properly treated as a motion to suppress.  *See State v. Wilson*, ___ N.C. App. ___, ___, 736 S.E.2d 614, 618 (2013).  "The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Biber*, 365 N.C. 162, 167-68, 712 S.E.2d 874, 878 (2011).

Conclusions of law are reviewed *de novo*. *Id*. at 168, 712 S.E.2d at 878. For a properly filed motion to suppress, "the burden is upon the [S]tate to demonstrate the admissibility of the challenged evidence[.]" *State v. Cheek*, 307 N.C. 552, 557, 299 S.E.2d 633, 636 (1983).

"Our courts have held that the taking of blood from a person constitutes a search under both" the United States and North Carolina Constitutions. *State v. Barkley*, 144 N.C. App. 514, 518, 551 S.E.2d 131, 134 (2001). This is because the drawing of blood "involve[s] a compelled physical intrusion beneath [a suspect]'s skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation. Such an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.'" *Missouri v. McNeely*, 569 U.S. ___, ___, 185 L. Ed. 2d 696, 704 (2013) (quoting *Winston v. Lee*, 470 U.S. 753, 760, 84 L. Ed. 2d 662, 668 (1985)). Accordingly, our Supreme Court has specifically held that "a search warrant *must be issued* before a blood sample can be obtained, unless probable cause and exigent circumstances exist that would justify a warrantless search." *State v. Carter*, 322 N.C. 709, 714, 370 S.E.2d 553, 556 (1988) (emphasis added).

The United States Supreme Court recently held that "the natural metabolization of alcohol in the bloodstream" does not create "a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases[.]" *McNeely*, 569 U.S. at ___, 185 L. Ed. 2d at 702. "Therefore, after the Supreme Court's decision in *McNeely*, the question for this Court remains whether, considering the totality of the circumstances, the facts of this case gave rise to an exigency sufficient to justify a warrantless search." *State v. Dahlquist*, ___ N.C. App. ___, ___, 752 S.E.2d 665, 667 (2013), *appeal dismissed and disc. rev. denied,* ___ N.C. ___, 755 S.E.2d 614 (2014).

In *McNeely*, a Missouri law enforcement officer initiated a traffic stop of the defendant for speeding and crossing the centerline. 569 U.S. at ___, 185 L. Ed. 2d at 702. The defendant displayed obvious signs of impairment and failed various field-sobriety tests. *Id*. As a result, the officer arrested the defendant and began to transport him to the station house. *Id*. While in transit, the defendant informed the officer he would not submit to a breath test. *Id.* Consequently, the officer took the defendant directly to a nearby hospital for a blood test. *Id*. The officer never attempted to obtain a warrant, but sought

defendant's consent for the blood test, which defendant refused. *Id.* at ___, 185 L. Ed. 2d at 702-03. The United States Supreme Court concluded that the results of this blood test were required to be suppressed pursuant to the Fourth Amendment because "in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." *Id.* at ___, 185 L. Ed. 2d at 715. In support of this conclusion, the Court provided the following example:

> Consider, for example, a situation in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer. In such a circumstance, there would be no plausible justification for an exception to the warrant requirement.

*Id.* at ___, 185 L. Ed. 2d at 708.

In the instant case, the trial court's unchallenged findings demonstrate that Deputy Fyle's actions fall squarely within the ambit of the example articulated by *McNeely*. The trial court found that Deputy Fyle had determined that he would seek to obtain a blood sample from defendant at 7:39 p.m. However, Deputy Fyle made no attempt to secure a warrant for

this blood draw. Instead, Deputy Fyle followed defendant to the hospital, despite the fact that Deputy Ryser was already traveling with the handcuffed defendant in the ambulance. There is nothing in the court's order or in the transcript which provides any explanation for the reason Deputy Fyle followed defendant rather than using the time to seek a warrant. Pursuant to *McNeely*, "[i]n such a circumstance, there [is] no plausible justification for an exception to the warrant requirement." *Id.*; *cf. State v. Granger*, ___ N.C. App. ___, ___, 761 S.E.2d 923, 928 (2014) (upholding a warrantless blood draw in part because "unlike the example in *McNeely*, [569] U.S. at ___, 185 L. Ed. 2d at 708, Officer Lippert was investigating the matter by himself and would have had to call and wait for another officer to arrive before he could travel to the magistrate to obtain a search warrant.").

Nonetheless, the majority contends that Deputy Fyle's actions were appropriate under this Court's decision in *Granger*. In that case, a law enforcement officer responded to the report of an accident in which the defendant had rear-ended another vehicle. *Granger*, ___ N.C. App. at ___, 761 S.E.2d at 924. When the officer arrived at the scene, he observed that the defendant was in pain and emanated a moderate odor of alcohol.

*Id.* The defendant was transported to the hospital before the officer could perform any sobriety tests. *Id.* Upon arrival, the defendant admitted to the officer that he had consumed alcohol and displayed clear signs of impairment. *Id.* The officer administered two portable breath tests, and both tests indicated the presence of alcohol on defendant's breath. *Id.* As a result, the officer obtained a warrantless blood sample from the defendant. *Id.* at ___, 761 S.E.2d at 925. This Court held that, under the totality of the circumstances, there was a sufficient exigency to support a warrantless blood draw. *Id.* at ___, 761 S.E.2d at 928. Specifically, the Court noted that (1) the officer was concerned about the dissipation of alcohol from the defendant's blood, because over an hour had elapsed since the accident occurred before the officer established sufficient probable cause to seek the blood draw; (2) the officer estimated that the time it would take to travel to the magistrate's office, obtain a warrant, and return to the hospital would be at least forty minutes; (3) the officer was investigating the matter alone, which would have required him to wait for another officer to arrive before he could travel to the magistrate's office to obtain a warrant; and (4) the officer was concerned that if he left the defendant unattended or waited any longer

for a blood draw, the hospital might have administered pain medication to the defendant that could contaminate his blood sample. *Id.*

*Granger* is distinguishable from the instant case. First and foremost, unlike the officer in *Granger*, Deputy Fyle was not the sole officer who accompanied defendant to the hospital. Instead, Deputy Ryser accompanied defendant in the ambulance, while Deputy Fyle followed behind the ambulance in his patrol car, despite the fact that he had already determined that he would seek to draw defendant's blood. Moreover, unlike the officer in *Granger*, Deputy Fyle had already completed his investigation and placed defendant under arrest on suspicion of DWI prior to defendant's transportation to and arrival at the hospital. The circumstances which this Court found justified the warrantless blood draw in *Granger* are simply not present in this case.

The majority contends that the appropriate disposition for this case is to remand for additional findings of fact regarding the availability of a magistrate and the additional time and uncertainties in obtaining a warrant. However, the trial court's conclusion of law reflects that the court considered

these factors and applied the appropriate totality of the circumstances test required by *McNeely*:

> Based upon the time elapsed to that point and the additional time and uncertainties in how much additional time would be needed to obtain a search warrant or other court order for the defendant's blood and all other attendant circumstances, the same gave rise to the existence of exigent circumstances and supported the officer's reasonable belief that the additional delay necessary to obtain a search warrant or court order under the circumstances would result in the dissipation of the percentage of alcohol in the defendant's blood.

While the majority is correct that the trial court could have made more explicit findings from Deputy Fyle's testimony regarding the availability of a magistrate and the ease of obtaining a warrant, there is a fundamental flaw in the premise that these additional findings could support the trial court's denial of the motion to suppress. The trial court's findings clearly indicate that Deputy Fyle determined he would obtain a sample of defendant's blood at approximately 7:39 p.m. Accordingly, any determination of exigent circumstances must be based upon whether, under the facts that existed at that time, Deputy Fyle could have reasonably taken the appropriate steps to secure a warrant while defendant was transported to the hospital by Deputy Ryser.

However, there is no evidence on this question in the record, because Deputy Fyle's testimony unequivocally indicates that he only considered whether exigent circumstances existed *after defendant was discharged from the hospital and refused to consent to the blood draw*. At that time, approximately ninety minutes had already elapsed since Deputy Fyle had arrested defendant on suspicion of DWI and determined that he would seek to obtain a sample of defendant's blood. Despite the fact that Deputy Ryser was with defendant, who was restrained in handcuffs in the back of the ambulance, and the additional fact that at least two other deputies were dispatched to the hospital to assist with defendant when he arrived, there is nothing in the record to suggest that Deputy Fyle ever attempted, or even considered attempting, taking steps to obtain a warrant in the time between defendant's arrest and his discharge from the hospital.

The majority speculates that it may still have not been reasonable for Deputy Fyle to seek a warrant while Deputy Ryser transported him to the hospital because "several officers were needed to control defendant and ensure the safety of the hospital personnel." This speculation into Deputy Fyle's motives at the time he followed defendant to the hospital is not

supported by any evidence that was presented during the hearing. Deputy Fyle restrained defendant in handcuffs without any physical altercation, deemed it unnecessary to travel together in the ambulance with Deputy Ryser and defendant, and never indicated at any point during his testimony that he went directly to the hospital due to safety concerns. Moreover, it was not until Deputy Fyle ordered the warrantless "invasion of [defendant's] bodily integrity," *McNeely*, 569 U.S. at ___, 185 L. Ed. 2d at 704, that defendant resisted sufficiently to require several officers to help control him.[3]

Ultimately, I conclude that the trial court's findings demonstrate that Deputy Fyle never considered whether a warrant was necessary during the ninety minutes after placing defendant in custody and determining that he would seek to draw defendant's blood. Therefore, "there [was] no plausible justification for an exception to the warrant requirement" under the totality of the circumstances. *McNeely*, 569 U.S. at ___, 185 L. Ed. 2d at 708. Deputy Fyle simply ignored our Supreme Court's long-established directive that "a search warrant must be issued before a blood sample can be obtained[.]" *Carter*, 322 N.C. at 714, 370 S.E.2d at 556. He then sought to impermissibly

---

[3] Defendant's conviction for communicating threats was based upon his belligerent behavior during the blood draw.

benefit from his failure to seek a warrant by asserting that an exigency existed at the moment the blood draw was to occur. At this point, it was far too late for Deputy Fyle to consider, for the first time, whether a warrant could reasonably be obtained.

Since neither the trial court's findings of fact nor any other evidence presented at the hearing support its conclusion of law that, based upon the totality of the circumstances, exigent circumstances existed to support defendant's warrantless blood draw, the trial court erred by denying defendant's motion to suppress the results of the blood test. The trial court's order should be reversed and remanded for the entry of an order suppressing this evidence. I respectfully dissent.